**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

```
MARY HELEN GAUTREAUX,            )
                                 )
                Plaintiff,       )    CIVIL ACTION
                                 )
v.                               )    No.  03-2298-MLB
                                 )
MASSACHUSETTS MUTUAL LIFE         )
INSURANCE COMPANY,               )
                                 )
                Defendant.       )
_____)
```

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**I.  INTRODUCTION**

This case comes before the court for resolution on stipulated facts.  (Docs. 35, 36.)  The parties have submitted trial briefs and proposed findings.  (Docs. 42, 43, 48, 49.)  Upon initial review, it appeared that some facts were still in dispute.  The court alerted the parties to this observation.  (Doc. 50.)  After consultation with one another, the parties submitted a handful of additional stipulations and implored the court to decide the matter without a trial, even inviting the court to resolve factual disputes and draw all reasonable inferences from the record presented.  (Docs. 51, 52.)  The court has reviewed all the submissions, and is prepared to rule.

This is an insurance case.  Defendant issued a policy that provided plaintiff with disability insurance coverage, subject to certain limitations.  Plaintiff submitted a claim for benefits, which defendant denied.  Plaintiff brought the present action alleging that defendant breached the insurance contract.  She seeks damages in the amount of $336,000.  Defendant denies that it breached the contract.  Instead, defendant asserts that plaintiff's disability is caused by

conditions that were expressly excluded from coverage by the policy's language.  (Doc. 25, Pretrial Order.)

Resolution of this matter is guided first by Federal Rule of Civil Procedure 52.  That rule provides that

> [i]n all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58.

However, when the parties submit the case on stipulated facts, the court need not make separate findings of fact; instead, the court may simply incorporate the stipulated facts into its order and make conclusions of law based on those facts.  See Gold v. United States, 552 F. Supp. 66, 67 (D. Colo. 1982).

The parties filed a Joint Stipulation of Undisputed Facts (Doc. 36), which the court incorporates by reference as its own Findings of Fact (FOF), and which is included as an appendix to this order.  The parties also filed a Joint Stipulation of Additional Evidence Pertaining to Disputed Facts.  (Doc. 37.)  The court finds that it need not resolve those issues, since the case can be decided on independent grounds.  Moreover, the court questions the propriety of resolving disputed facts without being afforded the opportunity to view live witnesses.  It is one thing to stipulate to facts and allow the court to apply the law to those facts.  It is quite another to stipulate that certain evidence bears on a disputed fact, and then ask the court to resolve that dispute on paper.

## I.  FACTS[1]

Plaintiff has suffered chronic back problems for most of her adult life.  She has undergone three surgical discectomies, the last of which occurred in 1979.  Throughout most of the 1980s she underwent chiropractic care and physical therapy for her back, culminating in her hospitalization for severe back pain in 1988.  The absence of additional stipulations related to the period of the early 1990s suggests that her conditions abated during that period.  However, they seem to have re-emerged in 1996, when she sought treatment from Ann Smith, M.D.  Dr. Smith prescribed Valium and Lortab for pain management.  Plaintiff continued to rely on these medications for over a year.  In addition to the re-emergence of her back problems, plaintiff was also diagnosed with severe depression in 1996, for which she has taken Prozac ever since.  (FOF at 6-8.)

In late 1998, plaintiff applied to defendant for long-term disability insurance coverage.  On April 14, 1999, defendant issued such a policy to plaintiff.  The policy provided that plaintiff would receive up to $2,000 per month if she became totally disabled.  However, in light of her history of back problems, as well as her history of severe depression, defendant issued the policy subject to a rider that provided as follows:

> The insurance will not cover any disability contributed to or caused by any psychological or emotional disease or disorder including treatment, surgery and complications thereof.

> The insurance will not cover any disability

---

[1] While Appendix A represents the formal findings of fact, the court will provide a narrative summary of the background facts, as well as those facts that bear most heavily on the case.

> contributed to or caused by any injury to or
> disorder of the spine including its muscles,
> ligaments, discs or nerve roots including
> treatment, surgery and complications thereof.

(FOF at 2 ¶ 8.).  Plaintiff harbored some concern and confusion over

the limitations of coverage imposed by this rider.  Accordingly, prior

to accepting the policy, she asked defendant to clarify the language

in the rider.  In response to that request, defendant replied with a

letter from its Director of Disability Income Claims, Roberta Bitzer.

That letter stated, in relevant part,

> If you were to suffer any disability contributed
> to or caused by any injury to or disorder of the
> spine, including its muscles, ligaments, discs,
> or nerve roots including treatment, surgery and
> complications thereof, for example, so severe
> that it resulted in a disability and, in all
> likelihood, would have done so even in the case
> of a person whose spine was completely normal,
> the exclusion would not apply, and the disability
> would be covered.
>
> On the other hand, if you were to suffer a
> relatively slight injury or sustain a disorder
> which would have resulted in a disability because
> of the existing condition of the spine, but which
> would not have had the same result in the case of
> a person whose spine was completely normal, the
> exclusion would apply and the disability would
> not be covered.
>
> While legally I cannot incorporate my letter of
> interpretation into your Modification of Coverage
> Rider or exclusion rider, this is an attempt to
> explain how policies issued with a Modification
> of Coverage Rider or exclusion rider may affect
> your eligibility for benefits should you become
> disabled in the future.

(FOF at 3 ¶ 11.)  Following receipt of this letter, on April 22, 1999,

plaintiff accepted the policy by signing the rider.  (FOF at 1-4.)

Then, on August 4, 1999, plaintiff presented to Dr. Stanley Sharp

with complaints of severe back pain.  The record is unclear exactly

-4-

what treatment, if any, Dr. Sharp prescribed as a result of this visit.   Thereafter, on August 12, 1999, plaintiff reported to Dr. Thomas Joseph that she fell and injured her ankle, knee, and arm. Interestingly, plaintiff later reported to Dr. Sharp that, on or about August 17, 1999, she fell, injuring her back and her ankle.   Then, on August 20, 1999, plaintiff informed Dr. Thomas that she had once again fallen.   (FOF at 8 ¶ 35.)

Following this string of falls and injuries, on August 31, 1999, plaintiff fell in her home.[2]  Plaintiff sought no immediate care for any injuries related to this fall.   On September 8, 1999, she contacted Dr. Sharp in order to obtain refills for her Valium and Lortab prescriptions.   She informed Dr. Sharp's office that she had been in an automobile accident, but failed to mention any falls.   A few days later, on September 14, 1999, she had an office visit with Dr. Sharp, in which she complained of injuries related to a car accident, but the doctor's notes make no mention of any falls.   (FOF at 9; Doc. 52.)

Finally, on September 20, 1999, plaintiff sought treatment for injuries related to the August 31 fall.   She informed Dr. Brian Healy that the majority of her discomfort was centered near her ankle, with some back pain as a consequence thereof.   Based on his evaluation, Dr. Healy decided to immobilize plaintiff's ankle with a "Cam walker." A couple of weeks later, on October 6, 1999, plaintiff presented to

---

[2] The parties note that some places in the record refer to this fall as having occurred on August 31, 1999, while other references are to September 1, 1999.  The parties agree that all such references are to the same fall.  (FOF at 4 n.1.)  Accordingly, the court will refer to this fall as having occurred on August 31, 1999.

Dr. James Garner with complaints that the Cam walker was causing her significant pain.  Dr. Garner removed the Cam walker and replaced it with a short-leg cast.  Plaintiff continued to complain about the effects of the ankle immobilization on her back; however, once the cast was removed, plaintiff informed Dr. Healy on November 3, 1999, that this "greatly relieved" her back pain.  (FOF at 9-10.)

Even though removal of the cast helped her back, plaintiff's leg pain continued unabated.  Following a visit with Dr. Healy in late December of 1999, plaintiff was referred to various specialists in an attempt to resolve her condition.  While the initial focus was on her ankle, after various bones scans, MRIs, and other tests, the investigation shifted to plaintiff's back as the potential source of her pain.  These tests and referrals were ongoing on February 21, 2000, when plaintiff presented to St. Joseph's Health Center with "uncontrollable" back pain.  (FOF at 12 ¶ 51.)  The pain abated almost as mysteriously as it arose, and plaintiff was promptly discharged. (FOF at 10-13.)

Finally, on March 21, 2000, plaintiff was referred to Dr. Daniel Downs, who recommended surgery to fuse her spine at L3-4 and L4-5. On May 24, 2000, Dr. Downs performed the recommended surgery, which he later characterized as successful in resolving any issues of spinal instability.  Nonetheless, plaintiff's medical records indicate that she has continued to complain of persistent back pain, for which she took prescription pain medications, even up through the end of 2002. (FOF at 14-15.)

Turning now to the claim for benefits at issue here, plaintiff first notified defendant of her claim for long-term disability

benefits on February 4, 2000.  She submitted her formal claim statement on March 3, 2000.  Although she fell on August 31, 1999, she alleged in her claim that her date of disability onset was September 10, 1999.  Even though she alleged that she was totally disabled from that date forward, she also noted that her last day of work did not occur until October 15, 1999, some six weeks after she became totally disabled.[3]  She claimed that she was disabled because the problems with her spine at L4-5 required her to take pain medication that prevented "clear-headedness or prolonged concentration."  Plaintiff denied that her condition was the result of her pre-existing spinal problems.  (FOF at 4-5.)

Defendant assigned Don Hacker, D.C., to review plaintiff's claim. Chiropractor Hacker concluded that, based on plaintiff's lack of complaints about back pain around the time of the fall, her back was probably not injured in that incident.  He further concluded that, in any event, "a normal lumbar spine of a female 50 years of age would not have incurred the impairment [plaintiff] has suffered."  (FOF at 15 ¶ 65.)  Based on Hacker's evaluation, along with its own review of plaintiff's medical record, defendant denied the claim on May 24, 2000.  (FOF at 15.)

Although the record is unclear on this matter, the stipulations regarding doctors' letters, evaluations, and reviews occurring after May 2000 suggests that plaintiff and defendant continued to communicate regarding her claim.  (FOF at 15-19.)  Indeed, defendant's

---

[3] This fact is noteworthy in that, by definition, total disability requires that the claimant be unable to work.  (FOF at 1-2 ¶ 4.)

denial letter specifically encouraged plaintiff to provide any additional information that might help establish her claim. (Doc. 30 exh. A-1 at 13.) Accordingly, the court infers that negotiations and evaluations continued in the months following the initial denial of benefits, and that plaintiff had additional opportunities to establish her entitlement to benefits under the insurance contract.

In December 2000, Dr. Downs continued to refine plaintiff's diagnosis. Among other problems that he then identified, Dr. Downs also diagnosed plaintiff with chronic pain syndrome, a mental disorder. (FOF at 16 ¶ 67.) In fact, Dr. Downs, plaintiff's treating physician, even went so far as to conclude that plaintiff was "not going to be employable because of her chronic pain syndrome and mechanical back instability." Id. ¶ 68.

In addition to Dr. Downs' analysis, defendant also sought review by Dr. Edward Prostic. Like Dr. Hacker, Dr. Prostic concluded that the only explanation for the severity of the injury plaintiff attributes to the August 31 fall was that it was a result of her pre-existing back problems. Moreover, like Dr. Downs, Dr. Prostic also concluded that plaintiff suffers from a mental disorder that contributes to any disability. (FOF at 17-19.)

## III.  ANALYSIS

Although employer-provided disability benefits are evaluated under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461, this is a private insurance policy governed by state law. In Goforth v. Franklin Life Ins. Co., 202 Kan. 413, 417, 449 P.2d 477, 481 (1969), Justice Earl O'Connor set forth the framework in which Kansas courts evaluate insurance policies:

-8-

> The language of a policy of insurance, like any other contract, must, if possible, be construed in such manner as to give effect to the intention of the parties. Where the terms of a policy of insurance are ambiguous or uncertain, conflicting or susceptible of more than one construction, the construction most favorable to the insured must prevail. Since the insurer prepares its own contracts, it has a duty to make the meaning clear. If the insurer intends to restrict or limit coverage provided in the policy, it must use clear and unambiguous language in doing so; otherwise, the policy will be liberally construed in favor of the insured. <u>If, however, the contract is clear and unambiguous, the words are to be taken and understood in their plain, ordinary and popular sense, and there is no need for judicial interpretation or the application of rules of liberal construction; the court's function is to enforce the contract according to its terms.</u>

(Emphasis added).

The relevant portions of the insurance contract provide as follows:

> The insurance will not cover any disability contributed to or caused by any psychological or emotional disease or disorder including treatment, surgery and complications thereof.
>
> The insurance will not cover any disability contributed to or caused by any injury to or disorder of the spine including its muscles, ligaments, discs or nerve roots including treatment, surgery and complications thereof.

(FOF at 2 ¶ 8.).

As discussed previously, one of defendant's managers, Roberta Bitzer, sent a letter to plaintiff purporting to clarify the manner in which claims would be evaluated under the second quoted paragraph. The parties spar at length over the legal effect of this letter. Defendant asserts that both language in the policy, as well as the last paragraph of the letter, preclude the letter from making any

modifications to the policy.  (Doc. 48 at 13-16.)  Plaintiff counters that this letter was issued prior to her having accepted the policy, and was a clarification upon which she relied in accepting the policy. Thus, she reasons, the letter should define the limits of the coverage that it addresses.  (Doc. 43 at 1-3.)

This matter is troubling.  Defendant's position appears to be that it was free to issue a letter through one of its managers purporting to describe how a policy term would be interpreted, but that this letter is meaningless because it was not issued by someone authorized to modify the terms of the agreement.  As a matter of principle, such a position smacks of deceitfulness and sharp practices.

Fortunately, the court need not resolve this question because it all revolves around the issue of the rider's exclusion of coverage related to spinal problems.  Instead, this case can be resolved based on the rider's exclusion of coverage for disabilities related to psychological or emotional disease.[4]  While plaintiff argues that the exclusion of coverage related to spinal injuries is ambiguous, and therefore urges the court to look to Bitzer's letter as evidence of what that term means, plaintiff fails to argue that the exclusion

_____

[4] Defendant suggests that the two provisions which the parties generally refer to as "riders" are contract terms, for which plaintiff bears the burden of proving a breach, rather than exclusions to coverage.  (Doc. 48 at 5-7 & n.1.)  By contrast, if the paragraphs restricting coverage in the event of psychological disorder and spinal disease were interpreted as exclusions to coverage, defendant would bear the burden of proving facts that invoke the exclusion.  Crist v. Hunan Palace, Inc., 277 Kan. 706, 711, 89 P.3d 573, 577 (2004).  In any event, this question is of no moment.  Even if defendant had the burden to prove that an exception applied, the court finds that defendant has met its burden as to the issue of psychological disorder.

related to psychological disorders is ambiguous.  The court finds this provision clear and unambiguous, and will enforce this part of the contract as written.  <u>Goforth</u>, 202 Kan. at 417, 449 P.2d at 481.

Although the stipulated facts may be unclear on a number of matters, they are quite clear on one thing: plaintiff's disability, if any, is caused or contributed to by a mental disorder.  Her own treating physician, Dr. Downs, concluded that her disability was caused in part by a mental disorder that he identified as chronic pain syndrome.  (FOF at 16 ¶¶ 67, 68, 70.)  While Dr. Prostic seemed to lament that chronic pain syndrome was a "wastebasket diagnosis" (FOF at 18 ¶ 77), he nonetheless unequivocally concluded that plaintiff had a psychological disorder that "overwhelms" her physical symptoms.  (FOF at 18 ¶ 75.)  In Dr. Prostic's opinion, plaintiff is likely a hypochondriac.  (FOF at 19.)  Regardless of the label assigned, doctors representing both parties concluded that this mental condition was contributing to plaintiff's alleged disability.  Since the language in the coverage rider expressly excluded coverage for "any disability contributed to or caused by any psychological or emotional disease or disorder," it is beyond dispute that plaintiff was not entitled to benefits under this insurance policy.

Accordingly, the court finds that plaintiff has failed to prove that defendant breached the insurance contract.  Judgment shall be entered for defendant.

A motion for reconsideration of this order is not encouraged. The standards governing motions to reconsider are well established. A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or

-11-

where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence.  Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate.  Comeau v. Rupp, 810 F. Supp. 1172 (D. Kan. 1992).  Any such motion shall not exceed three pages and shall strictly comply with the standards enunciated by this court in Comeau v. Rupp.  The response to any motion for reconsideration shall not exceed three pages.  No reply shall be filed.

IT IS SO ORDERED.

Dated this   29th   day of August 2005, at Wichita, Kansas.


                                        s/ Monti Belot
                                        Monti L. Belot
                                        UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

|  |  |  |
|---|---|---|
| MARY HELEN GAUTREAUX, | **)** | |
| | **)** | |
| Plaintiff, | **)** | **CIVIL ACTION** |
| | **)** | |
| v. | **)** | No.  03-2298-MLB |
| | **)** | |
| MASSACHUSETTS MUTUAL LIFE | **)** | |
| INSURANCE COMPANY, | **)** | |
| | **)** | |
| Defendant. | **)** | |
| | **)** | |

**APPENDIX A - FINDINGS OF FACT**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **MARY HELEN GAUTREAUX,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.:  03-2298-GTV-DJW** |
| | ) | |
| **MASSACHUSETTS MUTUAL LIFE** | ) | |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## JOINT STIPULATION OF UNDISPUTED FACTS

Pursuant to the Court's March 24, 2005 Order (Docket #35), the parties to the instant lawsuit hereby stipulate that following facts are established, for purposes of the Court's resolution of this lawsuit:

**Plaintiff's Disability-Insurance Coverage**

1.      Plaintiff applied to MMLIC for long-term-disability ("LTD") insurance on December 1, 1998.

2.      MMLIC issued Disability Income policy number 8,139,246 ("the Policy") to Plaintiff on April 14, 1999.

3.      The Policy stated that MMLIC "will pay the Total Disability Monthly Benefit shown in the Policy Specifications if the Insured is Totally Disabled."

4.      The Policy defined "Total Disability" as:

> The occurrence while this Policy is In Force of a condition caused by a Sickness or Injury, in which the Insured cannot perform the main duties of his/her Occupation and is not working at any other occupation for which he/she is

reasonably suited by education, training, or experience.
The Insured must be under a Doctor's Care.

5.        The Policy Specifications included with Plaintiff's Policy indicated that

her Total Disability Monthly Benefit was $2,000 per month.

6.        The Policy defined the "Waiting Period" as "The period immediately

following the start of Disability during which benefits do not accrue."  Plaintiff's Waiting

Period for benefits under the Policy was 180 days from the onset of disability.

7.        The Policy contained a provision labeled "Changing The Policy."  That

provision stated:

> An authorized officer of Our company must approve any
> change to the provisions of this Policy.  Our agents are not
> authorized to make changes or waive any provisions of this
> Policy.  If the change restricts any coverage, the change
> request must be signed by You.  All changes must be
> attached to the Policy.

8.        MMLIC issued the Policy to Plaintiff on April 14, 1999, subject to the

following "Modification of Coverage rider":

> The insurance will not cover any disability contributed to
> or caused by any psychological or emotional disease or
> disorder including treatment, surgery and complications
> thereof.

> The insurance will not cover any disability contributed to
> or caused by any injury to or disorder of the spine including
> its muscles, ligaments, discs or nerve roots including
> treatment, surgery and complications thereof.

9.        Plaintiff testified at deposition that she objected to the Modification of

Coverage rider because she believed that it "cover[ed] virtually nothing that I [had] a

problem with and any future event that I would have a problem with."

2

10.    Plaintiff testified that, before accepting the Policy, she asked MMLIC to clarify the language in the Modification of Coverage rider regarding the Policy's noncoverage of disabilities contributed to or caused by a spinal injury or disorder.

11.    MMLIC responded to Plaintiff's request for clarification with a letter from Roberta Bitzer, Director, Disability Income Claims, dated April 14, 1999.  Bitzer's letter to Plaintiff stated:

> If you were to suffer any disability contributed to or caused by any injury to or disorder of the spine, including its muscles, ligaments, discs, or nerve roots including treatment, surgery and complications thereof, for example, so severe that it resulted in a disability and, in all likelihood, would have done so even in the case of a person whose spine was completely normal, the exclusion would not apply, and the disability would be covered.

> On the other hand, if you were to suffer a relatively slight injury or sustain a disorder which would have resulted in a disability because of the existing condition of the spine, but which would not have had the same result in the case of a person whose spine was completely normal, the exclusion would apply and the disability would not be covered.

> While legally I cannot incorporate my letter of interpretation into your Modification of Coverage Rider or exclusion rider, this is an attempt to explain how policies issued with a Modification of Coverage Rider or exclusion rider may affect your eligibility for benefits should you become disabled in the future.

12.    Article IV, Section 1 of MMLIC's By-Laws states that MMLIC's Board of Directors shall annually elect a Chief Executive Officer, Chairman of the Board, President, Secretary, Treasurer, and "such other officers as it may deem necessary or convenient for the conduct of the business of the company."

3

13.     Section 2(A) of the Rules and Regulations of MMLIC's Board of Directors states that, among those other officers to be elected pursuant to Article IV, Section 1 of the By-Laws are a Chief Financial Officer, General Auditor, and General Counsel.  The Chief Executive Officer may also appoint other "senior officers."

14.     On April 14, 1999, Roberta Bitzer was employed by MMLIC in a Disability Claims Manager position known as Director, Disability Income Claims. MMLIC's records regarding Ms. Bitzer show that Ms. Bitzer was not an authorized officer of MMLIC on April 14, 1999, or at any other time.

15.     Plaintiff accepted the policy on April 22, 1999 by signing the Modification of Coverage rider.

**Plaintiff's Claim for Benefits**

16.     On February 4, 2000, Plaintiff notified MMLIC by telephone that she had a claim for LTD benefits.

17.     On February 15, 2000, in a telephone interview by a claims examiner from MMLIC, Plaintiff stated that, on August 31, 2000, she fell from the third or fourth step in her kitchen, and landed on her left ankle and hip.[1]

18.     Plaintiff submitted a "Disability Income Claimant's Statement" ("Claim Statement") dated March 3, 2000.

---

[1]     Medical records and other documents relevant to this case sometimes indicate that this accident occurred September 1, 1999.  For purposes of these Stipulations and all subsequent briefing in this case, the parties stipulate that all statements and documents regarding either an August 31, 1999 accident or a September 1, 1999 accident refer to the same accident.

4

19.     In her Claim Statement, Plaintiff alleged that she fell four steps.  On other occasions, however, Plaintiff provided conflicting information regarding the number of steps down which she fell – sometimes claiming to have fallen as many as seven steps.

20.     Although Plaintiff alleged in her Claim Statement that she became disabled September 10, 1999, her last day of work was October 15, 1999.

21.     In her Claim Statement, Plaintiff stated that she was injured on September 1, 1999, when she "fell down 4 stairs onto concrete kitchen floor, injuring L ankle [and] low back."  Plaintiff also stated that she had never had a similar injury.

22.     In her Claim Statement, Plaintiff asserted that, because of "severe narrowing of L4-5 intervertebral space [and] subluxation of L4 causing low back pain [and] spasm [with] sciatic nerve pain from low back to leg," she required medication that prevented "clear-headedness or prolonged concentration," and alleged that she was "unable to sit, stand bend or stretch without resulting pain."

23.     At deposition, Plaintiff testified as follows:

Q:     [Defendant's lawyer] Is it fair to say that the basis of your claim at the time that you filed the claim was the injury to your back?

A:     [Plaintiff] Yes, pretty clearly.

Q:     And do you believe that that's the reason – is that reason that you contend you're disabled today is your back injury?

A:     Oh, absolutely.

24.     Notes from a March 29, 2000 phone conversation between Plaintiff and a MMLIC representative state: "[Plaintiff] asserted that her back has been fine since 1988

5

when she was hospitalized for back pain.  She states that she had xrays [and] tests then [that] we may want to use as a baseline."

25.     Plaintiff's medical records show that she received medical treatment and medication for back pain throughout much of 1996, 1997, and 1998.

26.     After receiving Plaintiff's Claim Statement, MMLIC obtained and reviewed medical records from:

- United Medical Group and Washington Medical

- Providence Hospital

- Chartrand Clinic

- University of Kansas Hospital

- Dr. Daniel Downs

- Jackson County Orthopedics

- Dr. Charles Clough

- Dr. Thomas Joseph

- Michael Ryan

- Dr. Brian Healy

- St. Joseph's Health Center

- St. Joseph's Pain Management.

**Plaintiff's History of Spinal Injuries and Disorders**

27.     Prior to August 31, 1999, Plaintiff had a history of spinal injuries and disorders, including:

- surgery for discectomy and cervical fusion at C5-6 in 1971;

- surgery for discectomy and laminectomy at L5-S1 in 1972;

6

- surgery for discectomy at L4-5 in 1979;

- "chiropractic manipulation and physical therapy for pain relief" between 1980 and 1988;

- hospitalization for complaints of "severe right lower back discomfort with radiation of pain along the anterior right thigh to the knee" in January 1988;

- periodic medical treatment of back pain between August 1996 and August 1999.

28.     Diagnostic tests taken during Plaintiff's January 1988 hospitalization, including X-rays, a myelogram, and a CT scan of Plaintiff's spine, all showed no acute changes in Plaintiff's spine.

29.     Plaintiff's treating physician during the January 1988 hospitalization noted:

> The patient has a long past history of back problems and has had at least 3 previous back surgeries including 2 lumbar discectomies and laminectomies – L5,S1 and L4,L5 as well as C5,C6 discectomy and fusion.  Apparently no injury precipitated any of these problems and she knew of no injury precipitating the current episode.

30.     Nonetheless, during her January 1988 hospitalization, Plaintiff was placed in traction and given pain medications.  Plaintiff failed to complete a prescribed a course of physical therapy, and was eventually discharged with no conclusive findings as to the cause of her complaints of pain.

31.     In approximately 1988, Plaintiff pleaded guilty to a criminal charge of writing a fraudulent prescription for hydrocodone (a.k.a. Vicodin or Lortab).

32.     In approximately 1996, Plaintiff was diagnosed with major depression. Plaintiff has taken Prozac for her depression since 1996.

7

33.    On August 8, 1996, Plaintiff was seen by Ann K. Smith, M.D., for back pain.  Dr. Smith noted that Plaintiff had a "chronic history of back problems [and] after her 3rd back surgery spent a couple of years being 'a chronic back pain patient," and that "about every 6 to 9 months [Plaintiff] suffers an extreme episode of back pain with severe back spasm."

34.    Dr. Smith gave Plaintiff a prescription for Valium on August 8, 1996; Valium and Lortab on September 4, 1996; Valium and Lortab on June 30, 1997.  Plaintiff returned to the Chartrand Clinic on August 29, 1997 "for [recheck] on meds . . ."

35.    Plaintiff's medical records show a marked increase in reports of back pain in August 1999, even before the August 31 accident:

- On August 4, 1999, Plaintiff saw Dr. Stanley Sharp for complaints of "severe back pain."  Dr. Sharp's notes from that visit state that Plaintiff could not "walk or lie down without pain," and that Plaintiff had "multiple similar episodes in past of acute back pain," which were managed with multiple pain medications (Demerol, Lortab, and Valium), and physical therapy.

- Plaintiff reported to Dr. Sharp's office that, on or about August 17, 1999, she fell, hurting her ankle and back.  (On August 12, 1999, Plaintiff had reported to Dr. Thomas Joseph that she had fallen, injuring her ankle, knee, and arm.)

- On August 20, 1999, Plaintiff reported to Dr. Joseph that she had fallen again, and that she had also run her car into a curb.

**Injuries and Treatment Following August 1999 Accident**

36.    On August 31, 1999, Plaintiff obtained an insurance referral from her primary-care physician for a consultation and three follow-up visits regarding her ankle.

8

37.     Other than applying ice to her left ankle, Plaintiff did not obtain any
immediate medical treatment or consultation for any injury allegedly resulting from the
August 31 accident.

38.     In her initial report to MMLIC, which did not occur until February 4,
2000, Plaintiff stated that she had landed on her left ankle and hip during the August 31,
1999 accident.  She also stated that she had experienced moderate ankle swelling and a
stiff neck the day after the fall, and that her ankle was swollen and sore during the next
week.  Plaintiff later stated that she had landed on her left ankle, hip, and low back in the
August 31 accident.

39.     On September 8, 1999, Plaintiff contacted Dr. Sharp's office to request
refills of Valium and Lortab prescriptions.  She stated that she had been in a car accident,
but did not mention the August 31 fall.  Records of this request do not reflect that
Plaintiff complained about any new injuries.

40.     On September 14, 1999, Plaintiff saw Dr. Sharp for various complaints.
His notes from that visit state that Plaintiff had a motor-vehicle accident in which she was
"hit head on by a car that backed into her."  Dr. Sharp's notes from the September 14,
1999 visit do not contain any mention of the August 31 accident.

41.     Plaintiff first mentioned the August 31 accident to a healthcare provider
on September 20, 1999 – three weeks after the accident – when Dr. Brian Healy
examined her.  Dr. Healy noted that Plaintiff "says that the pain is more or less around
the ankle, both medially and laterally.  She has undergone 3 back surgeries in the past and
this has also tended to stir up the back pain which she feels is a normal consequence of

9

these problems." Dr. Healy recommended that Plaintiff immobilize her ankle by wearing a "Cam walker."

42.     Plaintiff saw Dr. James Garner, Jr., on October 6, 1999, for evaluation of left-ankle pain. Plaintiff stated that the Cam walker was causing significant pain. X-rays showed no evidence of fracture or dislocation of Plaintiff's left ankle, and Dr. Garner concluded that she had a "soft tissue injury to the left ankle . . . but at this time I think that she needs more rigid immobilization." Dr. Garner placed a short-leg cast on Plaintiff's left ankle.

43.     Plaintiff complained of back pain in an October 20, 1999 visit to Dr. Healy, who noted: "I think the cast is causing her back to continue to be symptomatic as she has had three back surgeries in the past and feels that this is probably irritating it." But by November 3, 1999, Plaintiff's short-leg cast had been removed, and Plaintiff reported to Dr. Healy that "this has greatly relieved her back pain." After removal of the leg cast, Dr. Healy's notes reflect no further complaints of back pain.

44.     Plaintiff underwent an MRI examination of her left ankle on October 28, 1999. The MRI report noted that Plaintiff complained of "continued pain about the left ankle region."

45.     Plaintiff again saw Dr. Healy on December 27, 1999 for complaints of leg pain. Dr. Healy theorized that the continuing leg pain was a byproduct of Plaintiff's previous spinal surgeries His notes state that Plaintiff:

> . . . is still having a lot of pain, this is radiating up into the leg. She has had numerous back surgeries in the past and I am not sure whether this radiculopathy or some sort of local irritation of the saphenous nerve laterally. For that reason we have removed her immobilization and having relieved the irritation has not solved the

10

problem and I am wondering therefore if this is more of a proximal radiculopathy.

46.     Dr. Michael Ryan, a neurologist, evaluated Plaintiff on January 7, 2000 to try to determine the source of Plaintiff's continuing leg pain. Notes from this evaluation include no mention of back pain. Dr. Ryan concluded that there was "[n]o current electrophysiologic evidence of a neuropathy, radiculopathy, plexopathy, or entrapment neuropathy identified at this time."

47.     For further investigation of the source of Plaintiff's leg pain, Dr. Healy ordered a bone scan, which was performed January 18, 2000. The bone-scan report states: "[d]egenerative changes are seen involving joints of the extremities. No specific abnormalities are seen over either lowe[r] extremity to suggest acute fracture. The possibility of a mild previous compression fracture at the lower L4 level or degenerative changes at the L4-5 level are suggested."

48.     Dr. Charles Clough, a neurosurgeon, examined Plaintiff on February 3, 2000, and reported: "In [August], she fell at home and subsequently has had unrelenting left leg pain . . . It is my understanding that her recent bone scan has been interpreted as showing possible compression fracture in the lumbar region." Dr. Clough's report made no mention of back pain. Dr. Clough scheduled Plaintiff to undergo an MRI.

49.     On February 11, 2000, Dr. Charles Horner performed an MRI on Plaintiff, and observed: "[d]egenerative disc changes seen at the L4-L5 and to a lesser extent the L5-S1 levels. There is marked disk space narrowing at the L4-L5 level with end plate degenerative changes, bulging disk, and grade I anteriolisthesis at L4 on L5. . . . There

11

appears to be some slight enhancement of the L4-L5 disk though this is thought to be related to degenerative disk changes . . . ."

50.    Dr. James Anthony conducted a radiologic examination of Plaintiff's lumbar spine from February 11, 2000, and reported:

- "Degenerative facet changes with a spondylolysis on the right" at the L4-5 level;

- "Large laminectomy defect at L4-5.  Complete loss of the normal disc space.  Left sided spondylolysis with a mild 4 to 5 mm spondylolisthesis.  Remainder of lumbar spine unremarkable."

51.    Plaintiff was admitted to St. Joseph Health Center on February 21, 2000 with complaints of "uncontrollable low back pain."  Dr. David Fritz examined Plaintiff on February 21, 2000.  He noted:

> [Plaintiff] is a 50-year-old white female with about a 5 month history of worsening back pain radiating into her left leg . . .  This pain began after a fall five months ago. Originally it was thought it was related to an ankle injury . . . She likens the pain down the left leg as being similar to that which she had prior to her L4-5 laminectomy.

52.    Dr. Donald Burkart conducted a radiologic examination of Plaintiff's lumbar spine on February 22, 2000.  His resulting impression was of "Degenerative disk disease involving most markedly the L4-5 interspace as well as the L5-S1 interspace. Postoperative changes of L4 and L5 laminectomies."

53.    After performing a radiologic exam of Plaintiff's "lateral lumbar spine with flexion and extension" on February 23, 2000, Dr. Charles Horner noted:

> Impression: Grade I anterolisthesis of L4 on 5, which appears mildly accentuated with flexion compared to the study of one day earlier.  However, the extension view has a fairly similar alignment compare to the flexion view. Some very slight motion of the L4-5 level is a

12

> consideration.  Marked disc space narrowing at the L4-5
> level with mild degenerative changes also seen at the L4-S1
> level.

54.     Plaintiff was discharged from St. Joseph's Health Center on February 26,

2000, with no conclusive findings to explain the sudden onset or abatement of Plaintiff's

reportedly "uncontrollable" back pain.

55.     Vincent Johnson, D.O., consulted with Plaintiff on March 1, 2000

regarding complaints of back and left-leg pain.  Dr. Johnson assessed Plaintiff with

"recurrence of radicular back pain" post multiple lumbar laminectomies, and

administered an epidural steroid-block injection.

56.     In a March 3, 2000 field interview conducted by a representative of

MMLIC, Plaintiff stated:

- that, in the August 1999 accident, she fell 5 steps and landed on her left ankle and hip;

- that the only immediate treatment she sought after the August 1999 accident was to apply ice to her left ankle;

- that she "felt immediate pain in the left ankle as if it was crushed," and that she later felt pain in her low back; and

- that she did not experience significant back pain after the August 1999 accident until a month after her doctors placed her left ankle in a cast.

57.     During the March 3, 2000 field interview, Plaintiff stated that, based on

the results of the January 18 bone scan and February 11 MRI, Dr. Healy had diagnosed

her with a compression fracture of L4-5 subluxation.  Plaintiff's medical records,

however, show that Dr. Healy never diagnosed Plaintiff with any specific back injury or

disorder after the August 1999 accident.

13

58.     Plaintiff's medical records also show that Plaintiff was never diagnosed with a compression fracture after the August 1999 accident.

59.     On March 21, 2000, Dr. Daniel Downs examined Plaintiff, and noted that:

- Plaintiff "has had some chronic back problems with acute exacerbation";

- Plaintiff has "degenerative disc problems," namely: "X-rays [of Plaintiff] show that the 4-5 level is collapsed, vertebral body on vertebral body.  No disc space maintained.  There is some maintenance of disc space at the 5 sacral level."

60.     Dr. Downs recommended that Plaintiff undergo "anterior inner body fusion at 3-4, 4-5."

61.     On May 24, 2000, Plaintiff underwent spinal-fusion surgery and pedicle-screw fixation of the L4-5 and L5-S1, with anterior cage array variety at L4-5, performed by Dr. Downs.

62.     Despite serious post-surgical pulmonary complications, Dr. Downs deemed the spinal surgery a success.  In a letter dated December 26, 2000, Dr. Daniel Downs stated that the spinal fusion he performed on Plaintiff in May 2000 "has been successful."

63.     On December 13, 2002, Plaintiff saw Dr. Downs for a follow-up examination of her spine after the May 2000 surgery.  Dr. Downs noted: "X-rays of the lumbosacral spine show a good fusion mass at L5-S1 and L4-5 with pedicles showing good fixation as well."

64.     Despite the successful stabilization of her spine, Plaintiff continued to report significant back pain:

14

- On March 22, 2002, Plaintiff reported to Dr. Sharp that he back pain was "persistent [and] unchanged."

- On July 15, 2002, Plaintiff reported to Dr. Sharp that she had fallen and hurt her knee.  Dr. Sharp noted "no effusion, no ecchymosis," and prescribed "no special [treatment] to [left] knee."

- In a December 26, 2002 report, Dr. Downs stated that Plaintiff "had several falls in past six months, [no] change in pain [with] back, still taking pain meds."

## **MMLIC's benefits determination**

65.    In or around May 2000, Don Hacker, D.C., reviewed Plaintiff's medical records that MMLIC had collected.  Based on his review of Plaintiff's medical records dating back to August 8, 1996, Dr. Hacker concluded:

> As X-rays of the lumbar spine were not initially taken at the time of the fall and low back complaints do not seem to be outstanding until Ms. Gautreaux's ankle [was] casted, it is questionable if her low back was affected in the fall.  In either event, a normal lumbar spine of a female 50 years of age would not have incurred the impairment Ms. Gautreaux has suffered.

66.    Based on Plaintiff's medical records and Dr. Hacker's opinion, MMLIC denied Plaintiff's claim in a letter dated May 24, 2000.  That letter explained to Plaintiff that MMLIC denied her claim because a typical 50-year-old female with a "normal lumbar spine . . . would not have incurred the impairment that you have presented as disabling."

67.    In a letter dated December 26, 2000, Dr. Downs stated that his diagnosis of Plaintiff  that Plaintiff was of:

- "spinal instability at L4-5 with retrolisthesis with degenerative disk disease at L5-S1 as associate with radiculopathy of the neural fibrosis and rachitides of the L5 nerve root on the right and left from previous surgical intervention' and

15

- "chronic pain syndrome status post lumbar fusion status post cardiac risks post pulmonary embolus."

68.     Dr. Downs further opined that Plaintiff was "not going to be employable because of her chronic pain syndrome and mechanical back instability."

69.     Dr. Downs stated that

[Plaintiff's] continued physical and mental limitations are based on back pain, radicular leg pain, and chronic pain syndrome that has developed with increasing severity over the last several months.

*          *          *

[Plaintiff] cannot sit for a long period of time because of mechanical back and neurogenic leg pain exacerbated by her severe chronic pain symptoms.

70.     Dr. Downs also completed a "Physician's Residual Functional Capacity" form in December 2000, on which he stated:

- that the degree of pain experienced by Plaintiff was "debilitating."

- In response to the question "Is there objective evidence demonstrating a condition which could reasonably be expected to give rise to this degree of pain?" Dr. Downs marked "Yes" and "No."

- In response to the question "Does your patient have any associated mental problems?" Dr. Downs indicated that Plaintiff had chronic pain syndrome and depression.

71.     Plaintiff initiated and underwent a functional-capacity evaluation ("FCE") in February 2003.  The FCE report stated:

- Plaintiff told the evaluator that she experienced low-back pain with radiation in left buttock, left leg, and occasionally into right leg;

- Plaintiff self-limited in almost all activities due to neck and back discomfort, resulting in zero data for most lifting categories;

CC 1401696v2

- Plaintiff's scores indicated that she was capable of a sedentary level of activity for lifting, carrying, and walking, but showed "intolerance" to prolonged activities while standing or sitting, and "poor tolerance" to walking; and

- recommended limiting Plaintiff's physical activities to sedentary activities "with all activities intermittent."

72.     In a letter dated March 3, 2003, Dr. Downs stated:

It is also my opinion, with a reasonable degree of medical certainty, that the severity of the injury sustained as a result of August of 1999 injury would have been disabling regardless of her earlier health problems. My opinion, furthermore, is that anyone with or without prior back history could have been disabled by this injury.

With the exception of the last sentence, the opinion expressed in Dr. Downs' March 2003 letter was taken verbatim from language supplied by Plaintiff's lawyer.

73.     Dr. Edward Prostic, an orthopedist, subsequently reviewed all available medical records regarding Plaintiff that the parties have collected and disclosed to each other in the course of this lawsuit. He concluded from this review that Plaintiff's alleged current disability "is certainly contributed to by preexisting disease in her low back. But for the history of pre-existing disease, the September 1, 1999 accident more probably than not would have caused only sprain and strain with resolution in 3-6 weeks."

74.     In support of this conclusion, Dr. Prostic stated:

- "I can find no objective data to show a change in her physical status following the September 1, 1999 accident until her [May 2000] surgery L4 to the sacrum. That surgery should have solved any problem of instability."

- "Following [the type of surgery Plaintiff underwent in May 2000], patients should be at medium level activity with lifting up to 30 to 40 pounds. [Plaintiff] should be able to sit and/or stand 50 minutes per hour for an eight hour workday."

17

75.     Dr. Prostic also stated that it was his opinion that "the patient has a psychological problem that overwhelms her physical condition," and that Plaintiff "is not totally disabled from gainful employment unless by psychological factors"

76.     In support of this conclusion, Dr. Prostic noted pain diagrams completed by Plaintiff in February 2003, which he deemed "clearly abnormal and suggestive of hysteria and hypochondriasis."  Dr. Prostic also stated:

> It is widely recognized that repetitious injuries and chronic back pain lead to psychological disorders with depression, hypochondriasis, and hysteria.  Once patients have sufficient abnormalities of these tendencies, additional orthopedic treatment is unlikely to be beneficial.  This is particularly true of people who have had low back surgery.  This patient's clinical presentation is classical for just such a problem with her previous surgery, extended periods of difficulty following low back injuries, new injury with minimal objective findings, and major complaints that lead a surgeon to operate in hopes of improving her but without significant benefit being obtained.

> *       *       *

> [Plaintiff] is a patient with chronic low back pain and sciatica with frequent periods of disability and history of extensive previous treatment.  Patients with this history often have psychological factors contributing to their feeling of disability.  There is no objective sign of worsening of her condition from the [August 31], 1999 accident.

> If [Plaintiff] is totally disabled this would likely be more from psychiatric factors than from purely orthopedic[] ones as patients with history of two-level discectomy and episodic sciatica can usually return to medium-level employment.

77.     With respect to Dr. Downs' diagnosis of chronic pain syndrome, Dr. Prostic stated that "[t]his is a wastebasket diagnosis that contains two major groups – those people with obvious sources of pain and those without.  Mrs. Gautreaux more likely

18

than not fits into the second group which is characterized by psychological factors such

as hysteria, depression, and/or hypochondriasis."

CC 1401696v2

Respectfully submitted,


LATHROP & GAGE


 s/ Richard N. Bien
Richard N. Bien, KS Dist. # 70101
Adam B. Walker, admitted *pro hac vice*
2345 Grand Blvd., Suite 2800
Kansas City, MO 64108
(816) 292-2000
(816) 292-2001 (fax)
ATTORNEYS FOR DEFENDANT


- and -


BURNETT & DRISKILL


 s/ Roger M. Driskill
Roger M. Driskill, KS Dist. # 70782
19 North Water Street
Liberty, MO 64068
(816) 781-4836
(816) 792-3634 (fax)
ATTORNEY FOR PLAINTIFF

CC 1401696v2